Good morning. My name is Cynthia Lee and I'm representing Kurtis Thorsted in this matter. Could you move the microphone just a little closer to you? There you go. Whatever weight one gives to the admittedly significant aggravating as well as mitigating factors that are presented by Mr. Thorsted's case before the district court, the district court committed reversible error by enhancing its calculation of the guidelines range in this case for the conscious or reckless creation of the risk of death or serious bodily injury. We know from this Court's decision in United States v. Munoz Camarena that the starting point for any determination of a reasonable sentence under the Sentencing Reform Act in 3553 is the correct calculation of that guideline range. And in this case, the district court chose to impose that adjustment, that two-level adjustment, to the offense level on a record that is absent evidence that Mr. Thorsted actually knew of the risk on which the court relied or that he was reckless in disregard of that risk, or rather in failing to perceive the risk that was at issue. Are you relying on the presence of his brain injury and the impact that it had on his ability to appreciate what he was doing as the basis for saying that the record fails to support the sentencing enhancement? No, Your Honor. What I'm relying upon, first, as to the consciousness element of the guideline enhancement, is the fact that the evidence before the district court indicated that the risk factors that were identified by the Coast Guard in a lengthy evidentiary hearing before the district court, that those risk factors, the high seas, the high winds, the low visibility, the low flight ceiling, these issues, and fatigue as well, these were not present on the occasions that Mr. Thorsted, the many occasions, that Mr. Thorsted made his calls to the Coast Guard. What I would also point out is that to the extent that the government relies upon in establishing, in attempting to establish consciousness, to the extent that the government relies upon the existence of the prior case, which under 3553 is clearly an aggravating factor, but for purposes of the analysis of consciousness, the prior case does not provide any support for a finding of consciousness in this case in 2009. What's the difference between this case and, for example, Johansson, where you have the tired drivers who are, the drivers who are certifying that they, falsely certifying that they haven't driven a lot. We don't know whether they were tired or not, but the enhancement was imposed because there was a risk of serious harm on the highways from people who didn't get enough sleep. I mean, what's the analytical difference here? I think the analytical difference here is that in Johansson, the issue was the violation of safety regulations. These were specific directives that were specifically geared towards safety issues. When you look to the issue of consciousness, and Johansson was decided on consciousness grounds, to the extent that the defendants in Johansson were falsifying information that went directly to the question of safety, that they knew went directly to the question of safety because these were the definition safety regulations, that's not what we have at issue in this case here. But to the extent that one is looking at consciousness, and because the courts and the parties agree that consciousness does require a subjective awareness of the risk, what you have is an individual who is making false mayday calls under circumstances that are not at all extraordinary, in contrast to the previous case, that are not at all extraordinary in terms of weather, in terms of visibility, in terms of the risk. Kagan. Why would they have to be extraordinary? Aren't there general risks that accompany any of the responses that are ordinarily made when a mayday call comes out? Well, I think that that issue is relevant and certainly what the government has relied upon for the recklessness angle. I think that to the extent that we're talking, if we're still talking about consciousness, then the fact remains that there is no evidence that Mr. Thorsett was aware of those particular risks. But why would you do it? Are you arguing that you have to have a different type of risk when the issue is whether there's a conscious awareness of them than you do when the issue is whether there is a reckless disregard? I think that case law does support that inference. I think that to the extent that one has a lesser degree of awareness, to the extent that we're talking simply about recklessness, we know from Johansson, and we know from Johansson's favorable reference to the Senate report accompanying the Major Guideline Enhancement, we know that Johansson was interested in the legislative history and the legislative intent behind this, and reckless has to mean something. The Senate report makes clear that reckless in this context refers to criminal negligence. We know that criminal negligence has been defined historically as involving a substantial unjustified risk of death or serious bodily injury when what we're talking about is death or bodily injury. And also that the failure to perceive that substantial and unjustified risk represents a gross deviation from what a reasonable person would understand under those circumstances. So this is not to deny that there is a theoretical risk to Coast Guard personnel who are responding in these situations, regardless of how ideal the conditions may be from a weather standpoint, from a visibility standpoint, or from a fatigue standpoint. The issue for consciousness, however, is the lack of awareness on the part of Mr. Thorstedt and the lack of any evidence to suggest subjective awareness. And for recklessness, leaving aside the issue of the substantial nature of the risk, what was apparent, what would have been apparent to a reasonable person in Mr. Thorstedt's situation at the time that he's making these false mayday calls is very much relevant to what a reasonable person in those circumstances and the weather threshold for criminal negligence has been met. Getting back to the original case, because it is a significant aggravating factor here, I would simply point out, however, that the existence of that particular case does not, for purposes of the analysis of the guidelines here, does not provide any further supporting evidence for the enhancement in this case, because the nature of the risk that was apparent, made apparent by the Coast Guard to Mr. Thorstedt in that case during the commission of the offense and the nature of the risk that was discussed at length in the sentencing proceedings in that case was a very different risk than the risk that was at issue in this particular case and would not have given him any notice of the type of risk on which the court and the government relied here. But, Johansson, I take your point on the fact that it was a safety violation and West Coast, I suppose, has the same issue that there ought to know, but do you know that there's a common sense factor that they're exposing other people to risk on the high seas, period, isn't there? There is absolutely a common sense factor. I mean, we had a case, I couldn't find it, I don't think it's cited, but a case I sat on many years ago where there was a, the two-level enhancement was imposed when there was a suspect in flight on the ground and the enhancement, I dissented in that case, but it's now case law and controls, that it was imposed because of the risk that a gun might go off from one of the people chasing it. I mean, if you're going that far on this enhancement, why isn't this within the wide range of discretion that's afforded the district court? Well, on the issue of recklessness, the district court did say, just as the court is suggesting by its question, that on some level, isn't it obvious to anybody who's making a false mayday call. I think what that skips over is a couple of different steps. One is, is it obvious to a person who's making a false mayday call, who's not claiming a need for search and rescue, but who's simply indicating a sort of generic mayday without specifying further what's going on, that it's not obvious to a person in that circumstance that the Coast Guard's response is going to involve the deployment of search and rescue teams, as opposed to a simple callback, a request for further information, or a determination, as was made apparently in the vast majority of the 51 calls, a determination that no response was going to be made at all in terms of the deployment of activity. It is absolutely obvious that the Coast Guard is going to respond in some way, but it is not obvious that the response is going to include the deployment of fixed-wing aircraft, of a helicopter, of rescue boats, et cetera. Furthermore, even if it were obvious that that were going to be apparent, we know from the evidentiary hearing that people recreationally engage in these activities, that it is common for not only the Coast Guard, but for ordinary citizens to engage in maritime activities at night in poor conditions, and that the level of the risk is not so quantitatively different in this particular sort of scenario, where the conditions that were identified by the government's own experts from the Coast Guard were not in large part present on these instances. So, yes, absolutely, it is obvious that by calling in a false mayday, you're going to get some kind of response from the Coast Guard. What is less obvious is that there's going to be the deployment of significant search-and-rescue activity. There wasn't in the vast majority of these calls, or that those search-and-rescue efforts are going to be so extended and so risky that the ordinary person, the ordinary reasonable person in the situation, would be aware of that, and so aware that it constitutes recklessness. Roberts, you're over your time. Thank you, counsel. Thank you. We'll hear from the government. May it please the Court. Good morning. My name is Lori Gray. I represent the United States. In this case, the record shows that the defendant's sentencing guideline range was both properly calculated and reasonable, and for that reason, this Court should affirm the sentence. I'd like to begin by addressing the enhancement, the two-level enhancement that was applied for the risk. I think we need to kind of get right to what's the issue that bothers me and I think bothers others on the Court, and that is we don't have any real discussion about what the guy's mental condition was, whether he couldn't prevent this, he couldn't in any way seem to control himself, so if nothing he does is really willful because he really doesn't know what he's doing, how should we address that? Nowhere in the record do we really know what this guy can or can't do and understand, and I'd like you to address that. Certainly. Your Honor, I think that in fact the record does show that he knew and could understand. With regard to the first case, the Court found in that case that, and this is an excerpt of Record 80 and 81, that the defendant demonstrated, quote, a level of thinking and planning and sophistication that made clear that he, quote, understood the nature and quality of the offense. Now, that was in the first case that the judge specifically found that. Now, get nearer to the mic. Would you say that again? I'm sorry. In the first case, the judge specifically found that the defendant demonstrated, quote, a level of thinking and planning and sophistication that made clear that he understood the nature and quality of the offense. That was in the first case, it's that excerpt of Record 80 and 81, and the Court in this case used that to make its finding that what Mr. Thorsted did clearly created a knowing risk of injury or death to others, that excerpt of Record 47. Defendant never filed a notice of incompetency or raised the issue or asked for an evaluation. That's clear from the record. And the district court, based on this prior conviction and based on the prior judge making his findings, found in this case that it was a knowing risk of injury. And I submit to this Court that the facts support that, and the district court's finding was not clearly erroneous. Defendant knew from that previous case that when he cried Mayday, and I disagree with counsel that when you say Mayday, there's anything generic about that, everyone in this courtroom knows defendant knew that was going to cause the Coast Guard to spring to action and do certain things. He knew that from his previous case, because in that case he gave a specific location, as he did five times in the case before the Court here. And when you give a specific location, part of the protocol of the Coast Guard, as was explained in that evidentiary hearing, is they're able to triangulate, do a ring analysis, they know the location, and they deploy their assets. So I submit to this Court the record's clear that the defendant knew that, in fact, his conduct would create this risk. And even if this Court would find that the district court below was clearly erroneous in that finding, the record also supports the two-level enhancement for creating the reckless risk. As we talked about, Johansson says that it's not a subjective analysis. What it is is the defendant, under a criminal negligence standard, has to be acting beyond what a reasonable person would do. And I submit to the Court here that defendant, by making 51 hoax calls, 51 times calling and lying and saying mayday certainly went beyond that standard of a reasonable person. And the fact that there was no ---- I think the element of 51 cuts both ways in a sense, and that is there's obviously an element of compulsive behavior here that suggests that he wasn't able to control himself. When I'd also like to address the fact that the defendant, just because the weather was calm and the seas weren't high, that that's a red herring. Thank goodness that that was the conditions and no one was hurt in this case. But because the defendant cried wolf and nobody was hurt, that's a red herring. And I would say that that's made clear in West Coast. In that particular case, a case where defendants sold faulty parts to the military for use in the aircraft, the Court wrote, and I know, Judge Thomas, you're familiar with this opinion. The fact that there have been few documented part failures is quite beside the point. A district court need not engage in a sophisticated probability analysis to apply the adjustment, where the consequences of failure are catastrophic. A low failure frequency is of limited relevance. And here, in fact, through the evidentiary hearing, it was clear that the failure would be catastrophic. Yes, Your Honor. I want to get back to the question that both Judge Fletcher and Judge Thomas raised, which is the part of the mental condition that is reflected in what you might call an impulse control problem. Certainly. Which he clearly had. So the district judge says, yes, I've taken this into account. It would have been higher. Right. It would have been a higher sentence if there wasn't this present – this injury that accounted for some of the conduct. But when you look at that inability to control himself reflected in the large number of calls made over the five-month period, can you address both how this Court ought to examine that in terms of the propriety of the enhancement, number one, and number two, how does the fact that he was able to conduct himself in a law-abiding fashion over the entire period of supervised release figure into that analysis? So I think that's – I know that's offered in the briefs as an argument for probation as opposed to incarceration, but he certainly did have the ability to comply with the law for at least that period. He did. And I thank you for pointing that out, because that shows that this impulse control problem, if it existed, he could modify and he could control. With regard to the enhancement, I start back, as I did in response to Judge Fletcher, that the Court found that he understood, he was able to appreciate the nature and the consequence of his actions. And again, defendants – defense counsel at no time raised any competency claim that he was unable to understand or that this should not have gone forward because we needed a psychology or psychiatrist evaluation. With regard to the sentence in this case, the reasonableness of the sentence, the guideline range as computed by the Court was 15 to 21 months, as I'm sure the Court's aware that was lower than the guideline comp by pre-trial – or excuse me, probation – and the government, because the district court found that the dollar figure was significantly lower, just based the analysis on the deployed assets. Having done that, the Court said, this clearly isn't a reasonable sentence. Looking at the factors under 3553A found that beyond the nature of the offense, the 51 calls, that the defendant also – there's a deterrence aspect. And simply forfeiting his marine radio and his other things weren't going to do the trick here because the Court found that any device could forward mayday calls, including cell phones or a computer if you had Skype access. And the Court conducted a very careful and considered analysis going through that. And then, yes, Your Honor, as part of that came to the end, the government asked for 36 months. Probation, while it came in at a lower guideline range, also asked for 36 months. The district court imposed a sentence of 30 months and said, at excerpt of Record 50, let me just further comment because I want everyone to understand my thinking. And then went through that because he was a real risk of danger, because there was a need for deterrence, and he specifically said, I'm mitigating because of this brain issue or compulsion, because but for that, I would have a much more significant sentence and it would be more significant in years. I think on this record, on these facts, the sentence was reasonable. The district court did not abuse its discretion. And the facts that the district court found were not clearly erroneous. Unless there are any other questions from the court, I would submit this matter. Thank you, counsel. The case is heard will be submitted for decision.
judges: Rosenthal, Fletcher B. , Thomas